IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD JOHNSON, )<br>)<br>    Plaintiff, )<br>)<br>    v. )<br>)<br>CITY OF CHICAGO, CHICAGO POLICE )<br>OFFICERS CHRISTOPHER KATALINIC, )<br>ROBERT McHALE, LOUIS GARCIA, CRAIG )<br>BROWNFIELD, CURTIS HINKLE, SHAUN )<br>WILLIAMS, NICHOLAS WHITE, JIM WALSH, )<br>and UNKNOWN CHICAGO POLICE OFFICERS, )<br>)<br>    Defendants. ) | 05 C 6545<br><br>Judge Hibbler<br><br>Magistrate Judge Valdez |

**DEFENDANT POLICE OFFICERS' L.R. 56.1(a)(3) STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF SUMMARY JUDGMENT**

Defendants Christopher Katalinic, Robert McHale, Louis Garcia, Craig Brownfield, Curtis Hinkle, Shaun Williams, Nicholas White, Jim Walsh (collectively the "Police Officer Defendants"), by their undersigned attorneys, and pursuant to Local Rule 56.1(a)(3), hereby submit this statement of undisputed material facts in support of their motion for summary judgment.

**Parties**

1. On April 17, 2005, Ronald Johnson ("Plaintiff"), his girlfriend, Alsusia Collins ("Alsusia"), and her daughter, Alicia Collins ("Alicia") were living in the upstairs unit of a two-flat apartment building located at 7630 South Euclid that Alsusia rented. (Ex. 1: Second Amended Complaint, ¶ 4; Ex. 2: Dep. of R. Johnson, pp. 8:12-14, 12:12-16, 12:22-24, 13:1-3; Ex. 3: Dep. of Alsusia, pp. 8:17-21, 9:9-14, 20:8-17).

2. In April of 2005, Chicago Police Officers Christopher Katalinic ("Katalinic") and Robert McHale ("McHale") were assigned to the 4th District tactical team. (Ex. 4: Dep. of C.

Katalinic p. 17:15-17; Ex. 5: Dep. of R. McHale, pp. 11:10-16, 19:17-20).

3. In April of 2005, Chicago Police Officers Craig Brownfield ("Brownfield") and Louis Garcia ("Garcia") were assigned to the 4th District as patrol officers. (Ex. 6: Dep. of C. Brownfield, pp. 4:21-24, 5:1-6; Ex. 7: Dep. of L. Garcia, pp:15:25, 16:1-2). On April 17, 2005, Brownfield and Garcia were assigned to Beat 432. (Ex. 5: Dep. of R. McHale, pp.155, 20-24, 156:1-3; Ex. 7: Dep. of L. Garcia, p. 17:16-17).

4. In April of 2005, Chicago Police Officers Curtis Hinkle ("Hinkle") and Shaun Williams ("Williams") were assigned to the 4th District as patrol officers. (Ex.8: Dep. of C. Hinkle, p. 13:20-22; Ex.9: Dep. of S. Williams, pp. 59:21-24, 68:2-4). On April 17, 2005, Hinkle and Williams were assigned to Beat 414. (Ex.8: Dep. of C. Hinkle, pp. 20:23-24, 21:1; Ex.9: Dep. of S. Williams, p. 60:4-5).

5. In April of 2005, Chicago Police Officer Jim Walsh[1] ("Walsh") and Chicago Police Officer Nicholas White ("White") were assigned to the 4th District as patrol officers. (Ex. 10: Dep. of J. Walsh p. 26:22-24; Ex. 11: Dep. of N. White, p. 14:21-24). On April 17, 2005, Walsh and White were assigned to Beat 424. (Ex. 10: Dep. of J. Walsh p. 27:1-2; Ex. 11: Dep. of N. White, p. 9:18-23).

**Identification of Officers**

6. Plaintiff testified that there were only five officers present at the scene of his arrest. (Ex. 12: Plaintiff's Responses to Defendant Officers' First Set of Interrogatories, ¶ 16; Ex. 2: Dep. of R. Johnson, pp. 167:8-13).

---

[1] At the time of Plaintiff's arrest, Defendant Walsh was not a Sergeant. He was promoted to Sergeant on March 16, 2006, before his deposition, and is often referred to as Sergeant during the course of his deposition. To avoid confusion here, Defendants refer to Sergeant Walsh as Officer Walsh.

2

7. Officers Katalinic and McHale are the officers whom Plaintiff describes as the white, plain clothes officers that stopped him as he was walking home. (Ex. 12: Plaintiff's Responses to Defendant Officers' First Set of Interrogatories, ¶¶ 16-4, 16-5; Ex. 2: Dep. of R. Johnson, p. 129:8-11). Officer McHale is the short officer who asked to see Plaintiff's identification. (Ex. 2: Dep. of R. Johnson, p. 130:6-17). Officer Katalinic is the medium-height officer who chased Plaintiff when he ran. (Ex. 2: Dep. of R. Johnson, p.135:2-8).

8. Officer Brownfield is a white male, approximately six-foot-one, 200 pounds. (Ex. 4: p. 87:2-7) Officer Garcia is a Hispanic male, approximately six feet tall, 260-280 pounds. (Ex. 7: Dep. of L. Garcia, p. 29:12-13, 16-21). Plaintiff described Officer Brownfield as the athletically built officer. (Ex. 2: Dep. of R. Johnson, pp. 163:18-14, 165:19, 23-24). Plaintiff described Officer Garcia as the Hispanic officer who allegedly put him in a choke hold and called him a "nigger." (Ex. 12: Plaintiff's Responses to Defendant Officers' First Set of Interrogatories, ¶ 16-1). On April 17, 2005, both Officers Brownfield and Garcia were in uniform. (Ex. 6: Dep. of C. Brownfield, p. 43:3-7; Ex. 7: Dep. of L. Garcia, p.16:17-19).

9. Officers Hinkle, Williams, and White are African American and Officer Walsh is white. (Ex. 19: Affidavit of J. Walsh, ¶ 4-6). Plaintiff testified that he encountered no African American officers at the scene of the arrest (Ex. 2: Dep. of R. Johnson, p. 117:12-14).

10. Plaintiff also describes a short, slight uniformed white officer with curly hair and glasses who was at the scene of the arrest, observing, and not "doing much of nothing." (Ex. 2: Dep. of R. Johnson, p. 165:5-10; Ex. 12: Plaintiff's Responses to Defendant Officers' First Set of Interrogatories, ¶ 16-2). Officer Walsh is 5 feet, 10 inches tall, and approximately 270 pounds; he is balding with short, straight, salt and pepper colored hair. (Ex. 19: Affidavit of J. Walsh, ¶ 6).

Other than being a little heavier, his physical description has not changed since April of 2005. (Ex. 19: Affidavit of J. Walsh, ¶ 6).

**Jurisdiction**

11. Plaintiff's action is brought pursuant to 42 U.S.C. Section 1983. (Ex. 1: Second Amended Complaint, ¶ 1).

12. Jurisdiction is based upon 28 U.S.C. §§ 1331. (Ex. 1: Second Amended Complaint, ¶ 2).

13. Venue is proper as Mr. Johnson is a resident of this judicial district, City of Chicago is a municipal corporation in this district, and the alleged events giving rise to Plaintiff's claims occurred within this district. (Ex. 1: Second Amended Complaint, ¶ 2).

**The Initial Encounter**

14. On April 17, 2005, Officers Katalinic and McHale were on duty in the 4th District, wearing plain clothes, and driving an unmarked police car with municipal plates. (Ex. 4: Dep. of C. Katalinic pp. 14:2-3, 41:10-19; Ex. 5: Dep. of R. McHale, pp. 21:2, 32:12-15, 190:6-17).

15. At approximately 9:00pm to 9:30pm, Officers Katalinic and McHale were dispatched to investigate a report that a black male in dark clothing was involved in a narcotics transaction in the area of 77th and Euclid. (Ex. 4: Dep. of C. Katalinic pp.33:12-14, 22-24, 34:2, 45:6-9; Ex. 5: Dep. of R. McHale, pp 28:18-23, 29:5-7).

16. Upon receiving the dispatch, with Officer McHale driving, Officers Katalinic and McHale proceeded to 7700 Euclid from the west heading eastbound. (Ex. 4: Dep. of C. Katalinic p. 35:11-14; Ex. 5: Dep. of R. McHale, pp. 31:12-13, 32:23-24, 33:1-2, 23-24).

17. As Officers Katalinic and McHale approached the intersection of 77th and Euclid, they

4

observed a black male subject in dark clothing walking northbound at the northwest corner of the intersection, fitting the description given on the dispatch. (Ex. 4: Dep. of C. Katalinic p. 35:11-14, 37:22-24, 38:1, 6; Ex. 5: Dep. of R. McHale, p.34:15-16). The man Officers Katalinic and McHale observed was Plaintiff, Ronald Johnson. (Ex. 4: Dep. of C. Katalinic p. 40:20-22; Ex. 5: Dep. of R. McHale, p.37:6-9). Plaintiff was wearing dark clothing at the time of his arrest. (Ex. 20: Arrest Photograph of Ronald Johnson).

18. Officer McHale observed that Plaintiff was walking at a hastened pace and that he glanced at Officer McHale a couple times over his shoulder, then looked him "dead in the eye" as the car pulled even with Plaintiff. (Ex. 5: Dep. of R. McHale, p. 41:3, 6-13, 21-24). Officer McHale found this behavior to be suspicious, and given that Plaintiff matched the description and location they had been given, Officer McHale decided to stop the car to conduct a field investigation. (Ex. 5: Dep. of R. McHale, pp. 41:9-13, 42:14-18). As an officer assigned to the tactical team, Officer McHale routinely dealt with narcotics related calls and had made hundreds of drug arrests. (Ex. 5: Dep. of R. McHale, pp. 11:20-21, 256:24, 257:1-2; Ex. 18: Affidavit of R. McHale, ¶ 3).

19. Officer McHale stopped the car on the corner of 77th and Euclid, and turned the car to go North on Euclid, a one-way, southbound street. (Ex. 5: Dep. of R. McHale, p. 35:6-10, 17-20; Ex. 2: Dep. of R. Johnson, pp. 128:10-17, 22-24, 129:1-3). Officer McHale stopped the car on the west side of the street, in front of 7658 Euclid, and exited the car. (Ex. 4: Dep. of C. Katalinic pp. 43:1-4, 44:45; Ex. 5: Dep. of R. McHale, p.44:16-17; Ex. 2: Dep. of R. Johnson, pp. 129:12-18).

20. Officer McHale approached Plaintiff and requested that he show him some identification. (Ex. 5: Dep. of R. McHale, p.51:7-8; Ex. 2: Dep. of R. Johnson, pp. 131:3). Plaintiff assumed that Officer McHale was a police officer. (Ex. 2: Dep. of R. Johnson, p. 130:14-15).

5

21. Plaintiff answered that he did not have any identification and Officer McHale proceeded to perform a brief cursory check for weapons by patting Plaintiff's waistband to make sure there were no weapons on him. (Ex. 4: Dep. of C. Katalinic, pp. 49:12-13, 22-23; Ex. 2: Dep. of R. Johnson, pp. 131:11). Officer McHale checked Plaintiff for weapons to protect himself and Officer Katalinic since he knew 77th and Euclid to be a high crime area with narcotics sales and gang violence. (Ex. 18: Affidavit of R. McHale; ¶ 4, Ex. 17: Affidavit of C. Katalinic, ¶ 4).

22. Prior to being stopped by Officers Katalinic and McHale, Plaintiff had rolled and smoked a cigarette as he was walking up Euclid towards his residence. (Ex. 2: Dep. of R. Johnson, pp. 131:13-16).

23. After the pat-down, Officer McHale observed a white and yellow Top brand cigarette box in Plaintiff's left hand. (Ex. 4: Dep. of C. Katalinic, p.51:22-24, 52:3-4; Ex. 5: Dep. of R. McHale, p. 58:5-8, 18-24; Ex. 2: Dep. of R. Johnson, p. 126:15-18). Officer McHale reached for the box, and according to Plaintiff, "snatched the box out of [his] hand." (Ex. 4: Dep. of Katalinic, p. 56:15-21; Ex. 5: Dep. of R. McHale, p. 59:24; Ex. 2: Dep. of R. Johnson, p.131:21).

24. According to Officers Katalinic and McHale, Plaintiff had attempted to conceal the white and yellow Top box by cupping it in his palm and holding it against his leg. (Ex. 4: Dep. of Katalinic, pp. 52:17-23, 53:5; Ex. 5: Dep. of R. McHale, p. 59:1-8). Officers Katalinic and McHale testified that when asked to reveal what was in his hand, Plaintiff held out the box, then yanked it away as Officer McHale reached for the box. (Ex. 4: Dep. of Katalinic, p. 56:3-11; Ex. 5: Dep. of R. McHale, pp. 59:15-24, 60:1-2). As Plaintiff pulled the box back, two knotted bags of cocaine fell to the ground. (Ex. 4: Dep. of Katalinic, pp. 56:21-23, 57:5-8; Ex. 5: Dep. of R. McHale, pp. 61:16-22).

25. Plaintiff turned away from Officer McHale and ran northbound towards his residence at 7360 South Euclid. (Ex. 4: Dep. of Katalinic, p. 60:2-3; Ex. 5: Dep. of R. McHale, p. 61:22; Ex. 2: Dep. of R. Johnson, pp. 12:14-16, 134:6, 22-24).

26. Officer Katalinic told Plaintiff to stop, and began to chase Plaintiff as soon as he started running. (Ex. 4: Dep. of Katalinic, pp 60:10-13, 63:4-6; Ex. 2: Dep. of R. Johnson, p. 135:16-18). Officer Katalinic caught up to Plaintiff on the cement stoop of the front doorway of 7360 S. Euclid where he grabbed both of Plaintiff's arms by the biceps then shifted his body weight to the rear causing both Katalinic and Plaintiff to fall to the ground. (Ex. 4: Dep. of Katalinic, p. 66:7-11, 74:2-3; Ex. 2: Dep. of R. Johnson, p. 138:10-20). Both Katalinic and Plaintiff hit the front door with some force before they fell to the ground. (Ex. 2: Dep. of R. Johnson, p. 140:9-15).

27. When Plaintiff was on the ground, Officer Katalinic was able to handcuff him, with the help of Officer McHale. (Ex. 4: Dep. of C. Katalinic, p. 82:10-12; Ex. 5: Dep. of R. McHale, pp. 98:24, 99:1; Ex. 2: Dep of R. Johnson, p. 141:1-8).

28. Neither Katalinic, nor McHale, who were dressed in plain clothes on April 17, 2005, ever kicked, punched, or otherwise physically abused Plaintiff in any way. (Ex. 2: Dep. of R. Johnson, p. 165:20-24). Plaintiff also admitted that neither officer involved in handcuffing him abused him in any way. (Ex. 2: Dep. of R. Johnson, p. 143:15-17). Although Officer Katalinic grabbed Plaintiff's arms to bring him to the ground after he ran from Officer McHale, Plaintiff testified that it was "fair game" as he had run from the police. (Ex. 2. Dep. of R. Johnson, p.166:1-2, 6-7).

**The Arrest**

29. While Officer Katalinic was chasing Plaintiff, and before they reached the front stoop of 7630 S. Euclid, Officer McHale went back to the unmarked squad car and radioed that they were involved in a foot chase with a black male heading northbound on Euclid from 77th. (Ex. 5: Dep. of R. McHale, pp. 101:10-16, 102:17-18, 103:2-5).

30. Officers Brownfield and Garcia, who were in uniform and driving a marked squad car, responded to the call that there was a foot chase and that the officers involved requested assistance. (Ex. 6: Dep. of C. Brownfield, pp. 15:7-11, 16:8-12, 43:3-7; Ex. 7: Dep. of L. Garcia, pp. 16:17-22, 19:13-21).

31. Officers Brownfield and Garcia arrived to find Plaintiff handcuffed on the stoop of 7630 S. Euclid. (Ex. 6: Dep. of C. Brownfield, p. 21:5-7, 15-16; Ex. 7: Dep. of L. Garcia, p. 27:3-5).

32. According to Plaintiff, the uniformed officers who arrived, Brownfield and Garcia, began to search the area, stepping on and kicking Plaintiff as they walked back and forth. (Ex. 2: Dep. of R. Johnson, pp. 143:22-24, 144:1-5).

33. Plaintiff testified that although he could not see the men who were kicking him and stepping on him, he knows it was uniformed officers, and not the plain clothes Officers, Katalinic and McHale, as they were at a distance from him, speaking to people in his house. (Ex. 2: Dep. of R. Johnson, pp. 145:2-5, 147:5-14).

34. Plaintiff also testified that one of the uniformed officers told him to open his mouth, possibly to check whether he was concealing drugs, then stuck a twig or branch in Plaintiff's mouth, approximately 5 or 6 inches long, and the thickness of a highlighter marker. (Ex. 2: Dep. of R. Johnson, pp. 144:6-11, 163:18-24, 164:1–2, 8-15). Plaintiff testified that a uniformed officer who

8

was athletically-built (Brownfield) put the twig in his mouth and it was not the "Mexican" officer. (Ex. 2: Dep. of R. Johnson, pp. 164:16-20, 165:2).

35. Plaintiff also noted that besides the "Mexican" officer (Garcia), and the athletically-built officer ( Brownfield), there was an additional uniformed officer with curly hair who was present. (Ex. 2: Dep. of R. Johnson, p. 165:5-9). Plaintiff recalled that the curly haired officer just seemed to be observing, and that it was the Hispanic officer (Garcia) and the athletically-built officer (Brownfield) who were "doing all of the walking over and kicking and stuff like that." (Ex. 2: Dep. of R. Johnson, p. 165:5-6, 9-10, 17-190).

36. Plaintiff testified that the kicking and stepping ended when one of the uniformed officers found a Top cigarette box in the yard that the officer said contained cocaine. (Ex. 2: Dep. of R. Johnson, pp. 149:4-5, 151:14-16, 20-21, 24, 152:1-3).

37. Plaintiff recalled that he was then picked up by some of the officers, and one of the plain clothes officers (Katalinic or McHale) asked for his identification, which Plaintiff told him was in the house. (Ex. 2: Dep. of R. Johnson, pp. 152:12-13, 23-24, 153:3-9). Officers Katalinic and McHale went into the building to obtain the identification. (Ex. 2: Dep. of R. Johnson, p. 153:8-10).

38. Plaintiff recalled that the "Mexican" officer (Garcia) laid Plaintiff on his back and put his knee on Plaintiff's neck and his forearm on Plaintiff's throat, constricting his breathing. (Ex. 2: Dep. of R. Johnson, p. 156:1-5, 11-16). Plaintiff testified that while Officer Garcia had him in a choke hold, he used racial slurs such as "nigger" and did not get off Plaintiff until the plain clothes officer returned from inside the house. (Ex. 2: Dep. of R. Johnson, p. 158:1-4, 19-23, 160:17-19). Garcia is the only officer Plaintiff alleged made any racial slurs. (Ex. 2: Dep. of R. Johnson, p. 162:15-18).

9

39. According to Plaintiff, the plain clothes officers, Katalinic and McHale, did not witness the choking incident, because they returned from the building at the end of the incident. (Ex. 2: Dep. of R. Johnson, pp. 158:14-23, 159:4-8).

40. Officers Brownfield and Garcia then walked Plaintiff to their squad car as it had a protective partition that Katalinic and McHale's unmarked car did not. (Ex. 5: Dep. of L. Garcia, p. 58:7-16; Ex. 6: Dep. of C. Brownfield, pp. 48:24, 49:1, 5-10; Ex. 2: Dep. of R. Johnson, p. 159:14-19).

41. Plaintiff was then transported by Officers Brownfield and Garcia in their squad car to the 4th District station located at 2255, East 103rd Street. (Ex. 5: Dep. of L. Garcia, pp. 59:24, 60:1-6; Ex. 6: Dep. of C. Brownfield, p. 56:12-13; Ex. 2: Dep. of R. Johnson, pp.166:16-19, 24, 167:1-6).

### The Retrieval of Plaintiff's Identification

42. After Officers Brownfield and Garcia arrived on the scene, Officer Katalinic began to do a cursory search of the area where Plaintiff had been running to see if he had dropped any additional narcotics or other contraband. (Ex. 4: Dep. of C. Katalinic, p. 90:3-8, 18-20; Ex. 5. Dep. of R. McHale, p. 171:18-19). After searching for approximately three to four minutes, Officer Katalinic proceeded to the doorway of 7630 Euclid where Officer McHale was speaking to an older black woman. (Ex. 4: Dep. of C. Katalinic, pp. 91:4-7, 93:13-19, 94:17-19; Ex. 5. Dep. of R. McHale, pp. 171:13-17).

43. The woman Officer McHale was speaking to was Alsusia Collins, who identified herself as Plaintiff's girlfriend and indicated that Plaintiff lived there with her. (Ex. 5: Dep. of R. McHale, p. 113:7-8). Officer McHale asked if Plaintiff had any identification, and Alsusia told him that it was upstairs. (Ex. 5: Dep. of R. McHale, p. 113:12-21; Ex. 3: Dep. of Alsusia, p. 93:6-10).

44. According to Alsusia, she locked the downstairs door, which entered into a common hallway, and proceeded to the upstairs apartment to retrieve Plaintiff's identification. (Ex. 3: Dep. of Alsusia, pp. 94:24, 95:1-4). Next, Alsusia testified that the officers broke through the downstairs door, and were beating on the upstairs door to her apartment, demanding to be let in. (Ex. 3: Dep. of Alsusia, pp. 95:5-7, 16-18, 123:4-6).

45. According to Alsusia, she opened the door to the apartment and told the officers, "You can step right here and look around and see what's going on." (Ex. 3: Dep. of Alsusia, p. 97:1-3, 9-10). The two of them stepped in two to three steps past the door. (Ex. 3: Dep. of Alsusia, p. 97:3-5). Alsusia then went into her bedroom to get Plaintiff's identification, and when she returned, the officers were standing near the doorway where she left them. (Ex. 3: Dep. of Alsusia, pp. 99:9-10, 101:4-9). Alsusia gave the officers Plaintiff's identification, and they turned around and left the building. (Ex. 3: Dep. of Alsusia, p. 103:9-11).

46. Alsusia's daughter, Alicia, testified that a tall, white plain clothes officer walked behind Alsusia when she left to get Plaintiff's identification, peeking in Alicia's room, and looking into the kitchen. (Ex. 13: Dep. of Alicia, p. 38:11-14, 21).

47. Both Alsusia and Alicia testified that the officers didn't damage anything inside the apartment. (Ex. 3: Dep. of Alsusia, p. 102:6-11; Ex. 13: Dep. of Alicia, p. 40:1-3). Alsusia testified that there were some nicks on the door to her apartment, but that there wasn't much damage and that she was not required to pay anything to fix it. (Ex. 3: Dep. of Alsusia, p.102:12-21).

48. Plaintiff testified that he did not know where the plain clothes officers went when they were inside the building, but that he later heard from Alsusia that they went upstairs to the apartment, that she "didn't let them go far," and that they looked around in the living room, but did

not search the house. (Ex. 2: Dep. of R. Johnson, pp. 160:17-22, 161:11-16, 162:6-12).

49. Officers Brownfield and Garcia never entered the building at 7630 Euclid.[2] (Ex. 6: Dep. of C. Brownfield, p. 37:5-6; Ex. 7: Dep. of L. Garcia, p. 37:14-15).

### The Remaining Officers

50. After Officers Brownfield and Garcia had arrived on the scene, and Plaintiff was in custody, Officer McHale saw Beat 414 drive by, followed shortly by Beat 424. (Ex. 5: Dep. of R. McHale, pp. 156:8-15, 163:2-13). As a radio communication had gone out that Plaintiff was already in custody, Beats 414 and 424 drove by 7630 S. Euclid, but the officers did not exit their cars. (Ex. 5: Dep. of R. McHale, pp. 156:7-7, 164:1-11).

51. Neither the Beat 414 officers, Hinkle and Williams, nor the Beat 424 officers, Walsh and White, have any memory of responding to a call at 7630 S. Euclid on April 17, 2005. (Ex. 8: Dep. of C. Hinkle, pp. 24:10-14, 25:14-16; Ex. 8: Dep. of S. Williams, pp. 60:16-19, 61:11-15; Ex. 10: Dep. of J. Walsh, pp. 8:20-22, 10:13-15; Ex. 11: Dep. of N. White, pp. 11:3-4, 12:1-8).

52. Officers Hinkle, Williams, Walsh, and White, never went to the 4th District station house in connection with the arrest of Plaintiff. (Ex. 17: Affidavit of C. Katalinic, ¶ 6; Ex. 18: Affidavit of R. McHale, ¶ 6).

### At the Station House

53. Once Officers Brownfield and Garcia arrived with Plaintiff at the 4th District station house, they escorted him inside and delivered him to the custody of Officers Katalinic and McHale for processing. (Ex. 7: Dep. of L. Garcia, p. 64:5-7; Ex. 6: Dep. of C. Brownfield, p. 57:9-14, 19-21;

---

[2] Officers Katalinic and McHale admit that they entered the building's common area, but deny that they ever entered the upstairs apartment. (Ex. 4: Dep. of C. Katalinic, p. 97:11-22; Ex. 5: Dep. of R. McHale, p. 184:12-15; Ex. 18: Affidavit of R. McHale, ¶ 5).

12

Ex. 5: Dep. of R. McHale, pp.193:21-22, 198:1-3).

54. While in route to the station house with Officers Brownfield and Garcia, Plaintiff did not request to be taken to the hospital. (Ex. 7: Dep. of L. Garcia, pp. 62:15-24, 63:1-2; Ex. 6: Dep. of C. Brownfield, p. 56:15-17, 21-23).

55. Plaintiff testified that once he arrived at the station house he complained about his eye to a short, uniformed officer, and requested to be taken to the hospital. (Ex. 2: Dep. of R. Johnson, pp. 167:20-21, 168:2-8).

56. Plaintiff further testified that the short officer then told his boss that Plaintiff had requested to go to the hospital, and that the boss responded that he would lose Plaintiff's identification, and that Plaintiff would have to be checked into the County as a John Doe. (Ex. 2: Dep. of R. Johnson, p. 168:10-14, 20-22). Plaintiff also claimed that this boss officer told Plaintiff that if he did not go to the hospital, he could get an I-bond and get out tomorrow, whereas if he went to the hospital he would "be in there two weeks." (Ex. 2: Dep. of R. Johnson, p. 168:22-24). The officer described by Plaintiff as the "boss" was not Officers Katalinic or McHale, nor any of the other officers Plaintiff described from the scene of the arrest. (Ex. 2: Dep. of R. Johnson, pp. 118:7-17, 169:6-9).

57. Plaintiff stated that he was scared of what the boss officer had said, and so he said that he did not want to go to the hospital. (Ex. 2: Dep. of R. Johnson, p. 170:6-8).

58. Plaintiff estimated that he was at the 4th District station house for possibly an hour, or an hour and a half, and that other than what the boss officer had said to him, no one else did anything to him that he found to be improper or abusive. (Ex. 2. Dep. of R. Johnson, p.170:15-23).

59. While at the 4th District station house, Officer McHale filled out a felony complaint

for possession of cocaine and Officer Katalinic prepared the arrest report and vice case report. (Ex. 4: Dep. of C. Katalinic, p. 119:17-18; Ex. 5: Dep. of R. McHale, pp. 205:19-24, 206:23-24, 207:1). After the felony complaint and arrest report were completed, they were presented to watch commander, Captain Patrick Kellam, who approved the charges. (Ex. 4: Dep. of C. Katalinic, pp. 130:5-10, 18-21, 131:17-18; Ex. 5: Dep. of R. McHale, p. 209:8-18).

### At Lockup

60.   Officers Katalinic and McHale then transported Plaintiff to the 5th District lockup, located at 727 East 111th Street, as the 4th District lockup facilities had been temporarily shut down. (Ex. 4: Dep. of C. Katalinic, p. 135:7-15; Ex. 5: Dep. of R. McHale, p. 213:3-10; Ex. 2: Dep. of R. Johnson, p. 171:1-5).

61.   Plaintiff testified that during the ride to lockup he and Officers Katalinic and McHale were talking about the hospital and that the officers said it didn't make a difference to them whether they went or not. (Ex. 2: Dep. of R. Johnson, p. 171:9-17). Plaintiff also testified that: (1) he didn't tell Officers Katalinic and McHale that he was in pain during the drive; (2) he was scared that if he went to the hospital "there was going to be a problem with them" so he waited until he got to lockup at 111th St.; and (3) that once he got away from the boss police officer he "kind of said" that he wanted to go to the hospital. (Ex. 2: Dep. of R. Johnson, pp. 172:12-18, 173:5-11, 13-14). Officers Katalinic and McHale testified that Plaintiff never mentioned that he was injured nor requested to be taken to the hospital during the ride to lockup. (Ex. 4: Dep. of C. Katalinic, p. 131:4-8, 136:3-8; Ex. 5: Dep. of R. McHale, pp. 214:7-11, 215:3-6).

62.   Immediately, when Plaintiff was brought into lockup, the lockup keeper, Officer Annor, asked Plaintiff a series of questions that must be asked to a person in custody, which included

whether he needed medical treatment, to which Plaintiff responded that he wanted to go to the hospital. (Ex. 4: Dep. of C. Katalinic, p. 138:16-22; Ex. 5: Dep. of R. McHale, p. 218:1-3, 12-18; Ex. 2: Dep. of R. Johnson, p. 173:15-19).

### **At the Hospital**

63. Officers Katalinic and McHale then transported Plaintiff to the closest hospital, which is Roseland Community Hospital, located at 45 West 111th Street. (Ex. 4: Dep. of C. Katalinic, p. 140:18-21; Ex. 5: Dep. of R. McHale, pp. 220:22-24, 221:1-3, 13:17; Ex. 2: Dep. or R. Johnson, p. 175:11, 21-22).

64. Once at Roseland, Plaintiff was first seen by a triage nurse who sent him to the section of the emergency room for patients with less severe injuries; Plaintiff was seen by Dr. Gregory Olsen. (Ex. 14: Dep. of. G. Olsen, pp. 19:7-8, 33:13-21, 52:19-24, 53:1-6).

65. During his examination, Dr. Olsen noted characteristics of Plaintiff that were indicative of cocaine intoxication, namely, that he had a rapid heartbeat and feelings of anxiousness. (Ex. 14: Dep. of Olsen, pp. 75:14-24, 76:1).

66. Plaintiff was given pain medication and a scratch on the right side of his torso was cleaned and dressed. (Ex. 2: Dep. of R. Johnson, p.176:11, 16-20; Ex. 14: Dep. of G. Olsen, p. 23:16-17). Plaintiff was also given instructions to follow up with the doctor on call which he did not follow. (Ex. 2: Dep. of R. Johnson, p. 179:17-24; Ex. 14: Dep. of G. Olsen, p. 26:15-16). Plaintiff was at Roseland Community Hospital for approximately one hour. (Ex. 2: Dep. of R. Johnson, p.179:13-16).

67. After Plaintiff was discharged by the hospital, Officers Katalinic and McHale then returned Plaintiff to the 5th District lockup. (Ex. 4: Dep. of C. Katalinic, p. 151:1-7; Ex. 2: Dep. of

R. Johnson, p. 180:11-15).

**<u>Dismissal</u>**

68. Plaintiff was charged with possession of a controlled substance. (Ex. 15: Arrest Report, p. 1; Ex. 5: Dep. of R. McHale, p. 214:2).

69. The items inventoried in connection with Plaintiff's arrest tested positive for cocaine by the Illinois State Police Crime Lab. (Ex. 21: April 21, 2005 Illinois State Police Report, prepared by forensic Scientist Charlotte A. Corbett, Ph.D.).

70. At a preliminary hearing on June 14, 2005, Judge Linehan dismissed the complaint against Plaintiff for lack of probable cause. (Ex 16: Dep. of S. Collins, p. 9:16-18, 13:1-3, 18:23-24; Ex. 22: Certified Statement of Conviction / Disposition).

71. The assistant state's attorney who conducted the preliminary hearing against Plaintiff, Suzi Collins, stated that although she did not know why Judge Linehan made a finding of no probable cause, it was not uncommon for him to make such a finding where a small amount of drugs was concerned and that .3 grams was a small amount of narcotics for a Possession of a Controlled Substance case . (Ex. 16: Dep. of S. Collins, pp. 13:1-3, 20:5-24, 21:2-11, 25:9-16, 26:15-19; Ex. 4: Dep. of C. Katalinic, p. 167:1-3).

72. Ms. Collins also testified that in her experience, a dismissal for lack of probable cause is not in any way indicative of innocence and that she would not have proceeded with a preliminary hearing if she thought Plaintiff was innocent. (Ex. 16: Dep. of S. Collins, p. 21:12-18, 27:9-23).

73. McHale testified at the preliminary hearing that he items Plaintiff dropped to the ground at the time of his arrest were inventoried, sent the Illinois State Police Crime Lab for testing, and that the testing came back positive for .3 grams of cocaine. (Ex. 23: Prelim. Hearing Transcript,

p. 6:11-17; Ex. 16: Dep. of S. Collins, p 18:5-19).

Dated: November 5, 2008 Respectfully submitted,

By: s/ Patricia J. Kendall
Assistant Corporation Counsel

Patricia J. Kendall
City of Chicago, Law Department
30 North LaSalle Street, Suite 1400
Chicago, IL 60602

17