1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4    RONALD JOHNSON,                 )
                                      )
 5            Plaintiff,              )
                                      )
 6       vs.                          ) NO. 05 C 6545
                                      )
 7    CITY OF CHICAGO, CHICAGO POLICE )
      OFFICER C. KATALINIC, CHICAGO   )
 8    POLICE OFFICER R. McHALE,       )
      CHICAGO POLICE OFFICER ARMOR    )
 9    (STAR #6224), and UNKNOWN       )
      CHICAGO POLICE OFFICERS,        )
10                                    )
              Defendants.             )
11

12            Deposition of ROBERT McHALE taken before

13    CHERYL F. GILMAN, C.S.R. and Notary Public, pursuant

14    to the Federal Rules of Civil Procedure for the United

15    States District Courts pertaining to the taking of

16    depositions, at Suite 100, 312 North May Street,

17    Chicago, Illinois, commencing at 10:00 o'clock a.m. on

18    the 31st day of July, A.D. 2006.

19

20

21

22

23

24
```

LEGALINK, a Merrill Communications Company
(312) 263-3524    (312) 236-8461



EXHIBIT

D

```
 1      A    Yes.

 2      Q    Did you receive a degree?

 3      A    No.

 4      Q    That was a total of about three years?

 5      A    Yes.

 6      Q    And where did you go to high school?

 7      A    St. Francis de Sales.

 8      Q    Where is that located?

 9      A    In the southeast side of Chicago.

10      Q    And you graduated in '84?

11      A    '82.

12      Q    What did you do between '82 and '84 before

13   you went to Western Illinois?

14      A    I was working right out of high school, and

15   then I went away for a couple of years at school.

16      Q    Where did you work after high school?

17      A    Northwest Industries. '82 to '84.

18      Q    If I understand, you worked at Northwest

19   Industries between high school and college, and you

20   went away when you went to Western Illinois?

21      A    Yes.

22      Q    At Northwest Industries what did you do?

23      A    Mail clerk.

24      Q    You started at the Chicago Police Department
```

1          What did the -- What did the dispatch say?

2     MS. KENDALL:  Objection.  Foundation.

3     MS. LISKOW:  Q  This call that you received you

4  think was approximately 9:00 p.m., what did you hear?

5     A     Disturbance of a male black in dark clothing.

6  Involved in narcotic trafficking in the city at 7700

7  South Euclid.

8     Q     You were given a disturbance.

9          Do you recall specifically what was said to

10  you over the radio?

11     MS. KENDALL:  Objection, form of the question.

12     MS. LISKOW:  Q  Do you remember dispatch that

13  there was a disturbance?

14     A     I don't recall exactly.

15     Q     So you don't recall what words were used by

16  dispatch?

17     A     Our calls usually aren't given over the air

18  like that.

19     Q     How do you receive the call?

20     A     They would call our beat number and say we're

21  sending something over.  Basically like an e-mail that

22  you're getting that is not broadcast over the city

23  zone.

24     Q     So you received it on the computer?

1       A       Yes.

2       Q       You didn't receive it auditorially, you

3       received it visually?

4       A       I believe that is how we receive it.

5       Q       Are you saying you believe because you can't

6       remember how you received it or you think it might

7       have been visually or do you remember receiving it

8       visually?

9       MS. KENDALL:  Objection to the form of the

10      question.

11      MS. LISKOW:  Q  Do you remember receiving this

12      dispatch visually?

13      A       Yes.

14      Q       And what you remember is that there is a

15      disturbance involving a male black in dark clothing

16      who was involved in drug trafficking, is that correct?

17      MS. KENDALL:  Objection, form of the question.

18      Misstates the testimony.

19      MS. LISKOW:  Q  Is that correct?

20      A       That is how I answered it, I believe, to be.

21      Sure.

22      Q       Did you receive any another information

23      besides what I just described?

24      A       I don't recall.

```
 1      Q    I'm sorry.  You first were coming from the
 2   west and you were --
 3      A    Driving eastbound.
 4      Q    But you don't remember what street you were
 5   on?
 6      A    77th Street.
 7      Q    Around 77th.
 8      A    Approaching Euclid.  I don't know where I was
 9   exactly.
10      Q    I'm sorry.  I want to make sure.
11           You were on 77th driving?
12      A    Yes.
13      Q    What is the next thing you remember
14   happening?
15      A    Seeing a single male black walking same
16   direction I was driving.
17      Q    Where exactly were you when you first saw
18   this black male?
19      A    I was approaching the corner of about 7658
20   South Euclid.
21      Q    When you say 7658 South Euclid, do you
22   remember that address precisely or are you estimating
23   that is where you were on the block?
24      A    I'm using an approximate address.
```

1    finally?

2            Thank you.

3            Why did you stop the car?

4    A    I was responding to the call, and Mr. Johnson

5    was the only person on the scene.

6    Q    Did Mr. Johnson -- You're talking about --

7    When you say Mr. Johnson, you're talking about this

8    black male who you saw?

9    A    Yes.

10   Q    Did he match the description on the dispatch?

11   A    Yes.

12   Q    What was he wearing?

13   A    Dark clothing.

14   Q    What kind of clothing?

15   A    Darker jacket, I don't recall the style.  I

16   believe he was wearing blue jeans.

17           And I also believe he had on a football

18   jersey.  I don't know if it was on the top or the

19   bottom.

20   Q    Were all these clothes visible to you when

21   you first saw him?

22   A    The dark clothing was visible.  The team logo

23   on his shirt, I don't recall.

24   Q    So his jacket was open and he had a football

```
1    Ronald Johnson when you were driving the car?

2        A    Besides what I said?

3        Q    Uh-huh.

4        A    I believe that's all.

5        Q    Did you stop the car suddenly?

6        A    What do you mean by suddenly?

7        Q    Did you slam on the brakes?

8        A    I don't usually slam on my brakes.

9        Q    How fast were you driving down the street

10   when you passed Ronald Johnson?

11       A    I was slow.  Less than ten miles an hour.

12       Q    Did you slow down more when you saw him?

13       A    That is my usual practice.

14       Q    So you were going faster than ten miles an

15   hour when you saw him, correct?

16       A    Probably before I got to him.  I may have

17   been going slower than the speed limit.

18       Q    You would have been going slower than the

19   speed limit just driving around?

20       A    If you're approaching the address of what

21   you're looking at, sometimes you'll slow it up.

22       Q    Do you remember driving slowly around this

23   area after you received this fast call or are you just

24   telling me what you would have done normally?
```

1         So it was pointed diagonally.

2         And so you're saying your partner came

3  around the front?

4    A   Yes.

5    Q   About how far away from you was the partner

6  when you first started speaking with Ronald Johnson?

7    A   Probably ten to fifteen feet also.

8    Q   And how far away was he from Ronald Johnson

9  when you first started speaking?

10        How far away from your partner, from Ronald

11  Johnson, when you first started speaking with Ronald

12  Johnson?

13    A   Still probably ten to fifteen feet.

14    Q   Would it be fair to say the three of you

15  formed a sort of triangle?

16    MS. KENDALL:  Objection to the form of the

17  question.

18    A   After the brief moment of the initial

19  response by me, my partner was able to position

20  himself behind Mr. Johnson two to three seconds after.

21    MS. LISKOW:  Q  I want to make sure I get the

22  sequence down.

23        You -- Moments after exiting your vehicle,

24  you started speaking with Mr. Johnson.  And your

1    partner came around the front of the parked car?

2        A    Yes.

3        Q    And at what point did your partner get behind

4    Mr. Johnson?

5        A    Probably, like I said, anywhere from three to

6    five seconds.

7        Q    Were you still speaking with Mr. Johnson when

8    your partner got behind him?

9        A    Yes.

10       Q    So after you said basically I need to talk

11   with you, so that is basically what you said to

12   Mr. Johnson, is that correct?

13       A    That is correct.

14       Q    What else did you say to him or did he say to

15   you?

16       A    He said something back to me.

17       Q    And what did he say?

18       A    Why are you stopping me?

19       Q    Did he say anything else?

20       A    Yes.

21       Q    What else did he say?

22       A    I said we're looking at some sales going on

23   over in the area here.

24            Basically I told him we had a call that we

LEGALINK, a Merrill Communications Company
(312) 263-3524    (312) 236-8461

```
 1          MS. KENDALL:  Let me make my objection.

 2               Objection, foundation.

 3          MS. LISKOW:  Q  How do you determine who is the

 4     business officer?

 5          MS. KENDALL:  Objection, foundation.

 6               Go ahead.

 7          A    A lot of times it's determined by who is

 8     driving.

 9          MS. LISKOW:  Q  Are you saying a lot of times --

10     It is usually the driver?

11          A    That is what I'm saying.

12          Q    Is it always the case?

13          A    Not always.

14          Q    When would it not be the case?

15          A    If the driver isn't the person that

16     approaches the conversation.

17          Q    So the first one to approach a conversation

18     becomes the business officer, is that fair to say?

19          A    That is fair to say, yes.

20          Q    How far behind Johnson was your partner

21     standing during the time you were talking to him --

22     around him?

23          A    Approximately a couple of feet.

24          Q    During the time that you were talking to
```

1    Q    Did you take the box from him?

2    A    No.

3    Q    Okay.  So you reached for the box with what

4    hand?  Do you remember?

5    A    I don't recall.

6    Q    What happened then?

7    A    I --

8    Q    I'm sorry.  At this point you're still ten to

9    fifteen feet away?

10   A    No.

11   Q    At what point did you get closer to him?

12   A    During the conversation.

13   Q    Do you remember at what point in the

14   conversation?

15   A    I was probably the closest to him when I was

16   asking him if he had identification on him.  I was

17   within a foot and a half.

18   Q    Is that because you were leaning towards him,

19   he was leaning towards you, or did you move toward

20   each other, do you remember?

21   A    I believe I moved towards him.

22   Q    When you moved towards him did he attempt to

23   move further back or did he stay in one spot?

24   A    I remember him moving a little bit sideways.

1            I think he felt uncomfortable.  I don't know

2    for sure.

3       Q    As you moved about a foot and a half -- is

4    that correct?  What you said?

5       A    Yes.

6       Q    When you were asking him for his ID, is that

7    correct?

8       A    That is correct.

9       Q    And then when you reached -- When you reached

10    for the TOP box you were about a foot and a half away

11    from him, is that correct, or did you walk --

12       A    A foot, a foot and a half.

13       Q    Did you move forward at all in your attempt

14    to reach the box?

15       A    No, just to reach with my arm.

16       Q    What happened next?

17       A    I was able to touch the box.  But he pulled

18    the box back.

19       Q    What happened next?

20       A    A couple of knotted bags of cocaine, they

21    were clearly bags of cocaine, two of them, they fell

22    to the ground, and he began to run northbound.

23       Q    He began to run --

24       A    Northbound.

1    Mr. Johnson, how did you position yourself in relation

2    to Mr. Johnson?

3        A    On top of him and to his immediate right.

4        Q    Did you lay on top of him --

5        A    My knee was probably digging in his rear end

6    or his leg.

7        Q    Which knee?  Would that have been your left

8    knee?

9        A    I don't recall, but probably.

10       Q    You don't recall?

11       A    I don't recall.

12       Q    Well, if it was your right knee, then --

13       A    Then I would have been exposed to him.  I

14   probably wouldn't have done the right.

15       Q    How far did you put your knee into his

16   buttock, correct, or leg?

17            You can't remember which one.

18       A    I think I was just doing it to lean on him.

19   I don't believe -- I don't think -- I wasn't striking

20   him with my knee. I think I just landed on him that

21   way.

22       Q    You used the word landed.

23            Does that mean that you sort of jumped on

24   him?

1     A    Yes.

2     Q    Do you remember how you described

3  Mr. Johnson?

4     A    Male black in his 20s.  I didn't know his

5  age.  I said we're northbound on Euclid from 77th.

6  That was it.

7     Q    Do you usually -- When you radio in a

8  description of a suspect, do you usually mention what

9  age they appear to be?

10     A    If you can.

11     Q    So it's standard to say gender, race and age?

12     A    If you can, height and age, clothing

13  description.

14     Q    Okay.  So --

15     A    Age is probably more towards the bottom.

16     Q    Did you describe Mr. Johnson's height or

17  clothing on this radio communication?

18     A    I don't believe I did.

19     Q    Why not?

20     A    It happened so quick, I don't know what was

21  said for sure.

22     Q    But you think you remember -- You remember

23  saying -- giving his gender, race and age --

24  approximate age?

1    Q   Was he hurt?

2    MS. KENDALL:  Objection to the form of the

3 question.

4    A   No.

5    MS. LISKOW:  Q  Did he complain at any point about

6 the handcuffs being too tight or anything like that?

7    A   No.

8    Q   Did he ever complain -- At this point did he

9 ever complain about anything?

10    A   No.

11    Q   So your partner finished searching the yard

12 because he was helping Mr. Johnson, is that correct?

13    A   Yes.

14    Q   Did your partner find anything in any of the

15 searches?

16    A   In the search?

17    Q   Uh-huh.

18       Well, in the search -- Let me ask you.

19       Did your partner find anything when he

20 searched the area next door?

21    A   I don't believe he did.

22    Q   Did you ask him if he found anything?

23    A   Probably.

24    Q   So you don't remember asking him?

1    A    The normal practice would be to find out.

2    Q    But you don't remember asking him?

3    A    I'm sure I did.

4    Q    So you remember asking him?

5    A    Yes.

6    Q    Do you remember when you asked him?

7    A    No.

8    Q    Do you remember if it was on the -- on the

9  scene at this area or was it maybe later at the

10  station?

11    A    I don't know.

12    Q    Did your partner find anything when he

13  searched 7630, that area?

14    A    No.

15    Q    And you know because you asked him?

16    A    Yes.

17    Q    What was he looking for?

18    MS. KENDALL:  Objection.  Calls for speculation.

19    A    Could have been many things.

20    MS. LISKOW:  Q  Did you ever ask Mr. Johnson where

21  is it, what did you do with it, anything like that?

22    A    Did I?

23    Q    Yes.

24    A    No.

1    A    Just usually -- just the particulars.  His

2   name and all that.

3    Q    But you don't know?

4    A    No, not for sure.

5    Q    You think he'd be gathering information for

6   the arrest report?

7    A    Yes.

8    Q    So you went to get papers.

9         How long did it take to get papers?

10   A    Just a minute.

11   Q    Did you come back to that cell where

12  Mr. Johnson was?

13   A    By then my partner was done.

14   Q    Your partner had left the cell?

15   A    Yes.

16   Q    And where did you and your partner go?

17   A    Right there, just on the other side of the

18  door.

19   Q    Did you fill out paperwork?

20   A    Yes.

21   Q    What paperwork did you fill out?

22   A    Myself?

23   Q    Uh-huh.

24   A    Felony complaint for possession of cocaine.

1     Q    Do you recognize the document?

2     A    Chicago Police Arrest Report.

3     Q    This is the document that you told me was

4   filled out by your partner?

5     A    Correct.

6     Q    I apologize, it is cut off on the side, but

7   Box No. 31, it says resisted arrest, correct?

8     A    Yes.

9     Q    And the box marked no is checked, correct?

10    A    Correct.

11    Q    Or labeled no.

12         Why was this -- Why was that box marked?

13    A    We were doing Ronald Johnson a favor and not

14   charging him with resisting arrest because that would

15   have been another felony.  He just ran, he didn't

16   resist.  That is how we went with it.  It's our

17   judgment.

18    Q    Why did you do him a favor?

19    A    He's in custody for possession of cocaine.  I

20   wasn't -- We weren't looking to compound any problems.

21    Q    So is that something you do for a lot for

22   people, for arrestees?

23    MS. KENDALL:  Objection to the form of the

24   question.

1     A    It's been done multiple times.

2     MS. LISKOW:   Q   Something about Mr. Johnson that

3     made you feel he wanted you to do him a favor?

4     A    No.

5     Q    Was he resisting arrest?  Did he resist

6     arrest?

7     A    Technically yes.

8     Q    Would just his struggling on the ground and

9     not letting you handcuff him for a period of time,

10    would that be considered resisting arrest?

11    A    Yes.

12    Q    Would running away from you be considered

13    resisting arrest?

14    A    No.

15    Q    Really, so -- Let me ask you this.

16         Did you ever identify yourselves as officers

17    when you first encountered Mr. Johnson?

18    A    Yes.

19    Q    What did you say to identify yourselves?

20    A    I told him I was police.

21    Q    Stop, police?  Do you remember what you said

22    specifically?

23    A    I said police.

24    Q    Did you have a badge on you?

```
 1       A    I can't recall.

 2       Q    Do you recall Mr. Johnson smoking a cigarette

 3   at any point after he was arrested?

 4       A    Not really.

 5       Q    Not really?

 6       A    No, I don't remember smoking a cigarette.

 7       Q    Just to clarify, you don't know if

 8   Mr. Johnson ran with the box in his hand when he ran

 9   away --

10       A    I don't know if he discarded it or not.

11       Q    Did you use force against Mr. Johnson?

12       MS. KENDALL:  Objection to the form of the

13   question.

14       A    I helped pull his arm back.

15       MS. LISKOW:  Q  Did you use force against

16   Mr. Johnson?

17       MS. KENDALL:  Objection.  Form of the question.

18   Asked and answered.  He answered it.

19       MS. LISKOW:  No, he didn't answer it.

20       MS. KENDALL:  He did answer it.  He said I pulled

21   his arm back.  How is that not his answer?

22       MS. LISKOW:  Did you use force against

23   Mr. Johnson?

24       MS. KENDALL:  It's not necessarily a yes or no
```

1     Q    Aside from the police academy, what training

2  have you received from the department?

3     A    Riot training maybe.

4     Q    And when did you receive that?

5     A    Probably a year ago.

6     Q    What else?

7     A    Just computer classes here and there.  Stuff

8  that we're -- mandatory learning.

9     Q    Like what?

10    A    Automated arrest reports.

11    Q    New technologies?

12    A    Yes.

13    Q    What about classes on any other topic besides

14 technology?

15    A    Street survival for three days.

16    Q    What is street survival?

17    A    Just a course of making officers aware of

18 tactics that are being used against law enforcement

19 agencies.

20    Q    When did you have the course?

21    A    About a year and a half ago maybe.

22    Q    Do you remember any other training with the

23 police academy?

24    A    Not that I can recall.