

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| RONALD JOHNSON, | ) |
| Plaintiff | ) |
| | ) No. 05 C 6545 |
| v. | ) |
| | ) The Honorable William J. Hibbler |
| CITY OF CHICAGO, CHICAGO POLICE OFFICERS CHRISTOPHER KATALINIC, ROBERT MCHALE, LOUIS GARCIA, CRAIG BROWNFIELD, CURTIS HINKLE, SHAUN WILLIAMS, NICHOLAS WHITE, JIM WALSH, AND UNKNOWN POLICE OFFICERS, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Ronald Johnson claims that several Chicago Police Officers violated his civil rights when they arrested him in April 2005. Johnson sues the individual officers, alleging several 42 U.S.C. § 1983 claims and related state common law claims against the officers as well as several *Monell* claims against the City of Chicago. Both Plaintiff and Defendants have moved for summary judgment on some or all of Johnson's claims.

### I. Factual Background

Around 9 p.m. on April 17, 2005, Ronald Johnson was walking on South Euclid Avenue near his Chicago, Illinois apartment. (Def. Officers St. ¶¶ 1, 17). Around the same time, Officers Christopher Katalinic and Robert McHale patrolled nearby, dressed in plain clothes and traveling in an unmarked police car with municipal plates. (Def. Officers St. ¶ 14). While on patrol, Katalinic and McHale received a dispatch to investigate an alleged narcotics transaction that allegedly occurred on

1

Euclid Avenue. (Katalinic Dep. at 33-34; McHale Dep. at 28-29). The dispatch, however, provided only the most general description of the alleged suspect. (Def. Officers Ex. 23 at 7). When the Officers reached the intersection of 77th Street and Euclid Avenue, they noticed nothing suspicious. Instead, the officers noticed only that Johnson was walking in the area. (Def. Officers Ex. 23 at 7).

Katalinic and McHale stopped the car near Johnson's home, and then exited the car. (Def. Officers St. ¶ 19). McHale, who was not in uniform, approached Johnson and asked for identification, though did not announce himself as a police officer. (Def. Officers St. ¶ 20; Johnson Dep. at 130). Johnson informed McHale that he did not have any identification, and McHale proceeded to search him for concealed weapons. (Def. Officers St. ¶ 21). After the search, McHale noticed a cigarette box in Johnson's left hand. (Def. Officers St. ¶ 23). At this point, the parties' version of events diverge wildly.

According to Johnson, the box contained nothing but material to roll cigarettes. (Johnson Dep. at 185). Johnson attempted to ask McHale, "what's going on," but McHale snatched the cigarette box out of Johnson's hand. (Johnson Dep. at 131). At this point, Johnson became concerned for his safety and turned towards his home, which was just a few feet away, to retrieve his identification and to inform his girlfriend or her daughter, Alsusia and Alicia Collins[1], of the incident. (Johnson Dep. at 131-132). According to Johnson, he told McHale that he was going to retrieve his identification before turning to walk to his home. (Johnson Dep. at 131-136). Johnson claims that neither McHale nor Katalinic told Johnson to stop, but as Johnson walked away McHale told him to "come here." (Johnson Dep. at 136). As Johnson reached the steps leading to his apartment, Officer Katalinic tackled him from behind. (Johnson Dep. at 135-36).

---

[1] To avoid confusion, the Court will refer to the Collins' by their first names, Alsusia and Alicia.

2

McHale and Katalinic describe the events leading to Johnson's arrest differently. McHale and Katalinic testified at their depositions that Johnson attempted to hide the cigarette box by cupping it in his palm and holding it against his leg. (McHale Dep. at 59; Katalinic Dep. at 52-53). The officers further testified that when McHale reached for the box, Johnson pulled it back and two knotted bags containing cocaine fell to the ground. (McHale Dep. at 59-61; Katalinic Dep. at 56-57). The officers' testimony, however, differs from the arrest report filed on the date of the incident. In that report, which both McHale and Katalinic signed, they claim that they observed Johnson drop from his left hand two clear knotted bags containing cocaine *upon their approach*. (Pl. St. Ex. W). The officers claim that after the bags fell from the cigarette box, Johnson turned and ran from them. (Def. Officers St. ¶ 25). Neither officer ordered Johnson to stop.[2]

While Katalinic chased and tackled Johnson, McHale returned to the car and radioed for assistance. (Def. Officers St. ¶ 29). Officers Craig Brownfield and Louis Garcia reached the scene first. (Def. Officers St. ¶¶ 30-31). Other cars arrived, and although neither Johnson, nor Alsusia nor Alicia could identify particular officers, at least one additional squad cars were parked and empty at Johnson's residence. (Alsusia Dep. at 112-113; Alicia Dep. at 48-49). In addition, the Chicago Police Department's Event Query indicates three marked squad cars, cars 414, 424, and 432 assisted at the arrest site. (Pl. St. Ex. I).

According to Johnson, the officers proceeded to kick him in the head and side, walk across him as he was cuffed and face down on the steps, beat him, and utter racial slurs. (Johnson Dep. 143-148). Johnson could not identify which of the officers kicked or abused him because he was kept face down.

---

[2] The officers assert that it is undisputed that they told Johnson to stop. (Def. Officers St. ¶ 26). Contrary to the officers' assertion, however, Officer Katalinic testified he typically *would* have told him to stop, but can't recall that he did. (Katalinic Dep. at 60). Katalinic further testified that he never heard McHale tell him to stop. (Katalinic Dep. at 60, 65).

3

(Johnson Dep. at 144). At one point in the alleged beating, one of the officers, possibly Brownfield, shoved a stick in Johnson's mouth. (Johnson Dep. at 144, 164).

Still in search of Johnson's identification, McHale and Katalinic entered the apartment building that Johnson shared with Alsusia and her daughter, Alicia. (Def. Officers St. ¶ 37). While McHale and Katalinic were in the building, Garcia allegedly put Johnson in a chokehold and uttered racial slurs towards him. (Def. Officers St. ¶ 38). In the vestibule of the building, McHale asked Alsusia, who identified herself as Johnson's girlfriend, if Johnson had any identification. (Def. Officers St. ¶ 43). Alsusia told the officers Johnson's identification was upstairs and went to retrieve it. (Def. Officers St. ¶ 44). Rather than wait for her to return, McHale and Katalinic followed her upstairs, allegedly cursing and threatening to break down the door to the apartment. (Alsusia Dep. at 94-95; Alicia Dep. at 37-38).

According to Alicia, Alsusia opened the door and told the officers they could "stand right there and look around" while she retrieved the identification. (Alicia Dep. at 38). Contrary to Alsusia's instructions, McHale and Katalinic peeked into several rooms of the apartment including the kitchen and a bedroom. (Def. Officers St. ¶ 46). After McHale and Katalinic returned with Johnson's identification, Brownfield and Garcia took Johnson to the police station. (Def. Officers St. ¶¶ 53-54).

Upon arriving at the station, Johnson complained to an unnamed officer that he was in pain and requested a visit to the hospital. (Def. Officers St. ¶ 55). According to Johnson, a "boss" officer threatened to "lose" Johnson's identification if he went to the hospital, which would necessitate a substantially longer period before Johnson could be released. (Def. Officers St. ¶ 56). After some time, Katalinic and McHale took Johnson to the Fifth District lockup, but Johnson worried about retaliation from Katalinic and McHale if he requested a trip to the hospital. (Def. Officers St. ¶ 60-61; Johnson

Dep. at 171-174). Katalinic and McHale took Johnson to the hospital only after he requested medical treatment upon arriving at the lockup facility. (Def. Officers St. ¶¶ 62-63).

## II. Standard of Review

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct., 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating there is no genuine issue of material fact, and judgment as a matter of law should be granted in their favor.Fed.R.Civ.P. 56(c). Once the moving party has met the initial burden, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine [material] issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F.3d 620, 628 (7th Cir. 2006). *Roger Whitmore's Auto. Servs. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir.2005). During the Court's review, it must view all evidence and inferences in the light most favorable to the nonmoving party. *Id.* at 255.

## III. Discussion

*A. Excessive Force & State Law Battery Claims*

McHale and Katalinic urge the Court to grant summary judgment in their favor on Johnson's excessive force claim. Courts apply a reasonableness standard to evaluate excessive force claims, where reasonableness is judged from the perspective of an officer on the scene and not with the benefit of 20/20 hindsight. *Graham v. Connor*, 490 U.S. 386, 395-96, 109 S.Ct. 1865, 194 L.Ed.2d 443 (1989).

Whether the amount of force that officers used is reasonable turns upon the particular factors of a given case, including the severity of the crime at issue, whether the suspect posed an immediate threat to the officers, and whether the suspect resisted arrest or attempted to flee. *Id.* In addition, courts must allow for the fact that police officers must often make split-second decisions in tense, uncertain or rapidly evolving situations. *Id.* At the same time, if material factual contentions are in dispute, summary judgment on an excessive force claim is not appropriate because the reasonableness inquiry requires the jury to sift through the facts and draw inferences from them. *Sallenger v. Oakes*, 473 F.3d 731, 741 (7th Cir. 2007).

McHale and Katalinic argue that their actions in taking Johnson down upon the steps of his apartment were reasonable because he failed to comply with a verbal order. In a situation where an offender resists arrest, it is reasonable for officers to employ sufficient force to overcome that resistance. *Mayer v. Skelly*, No. 98-2217, 1998 WL 894652, *3 (7th Cir. Dec. 18, 1998). As a general principle of law, the officers' argument is sound. The problem for the officers, however, is that the underlying facts on which they base this argument are in dispute.

McHale and Katalinic assert that they stopped Johnson incident to a report on a narcotics transaction and that Johnson behaved suspiciously both before and during the stop. As noted earlier, the officers' assertion that Johnson behaved suspiciously is not supported by the record. One of them, in fact, testified that *nothing* about Johnson's behavior was suspicious. Next, McHale and Katalinic assert that Johnson does not dispute that he fled from the officers and ignored Katalinic's command to stop. Johnson, however, alleges that he told the officers that he was returning to his house to retrieve identification and that he walked away. More importantly, Johnson disputes that either officer instructed him to stop. In fact, even the officers themselves do not point to evidence in the record that suggests that Katalinic instructed Johnson to stop. Instead, Katalinic testified that he did not recall

6

instructing Johnson to stop but that he probably would have. The officers base their initial use of force against Johnson on the proposition that such force was needed to apprehend a fleeing suspect. A genuine issue of material fact exists regarding whether Johnson fled despite lawful commands from police officers, and summary judgment is therefore not appropriate.

McHale and Katalinic also argue that they employed no additional force other than that necessary to apprehend Johnson. Again, this argument rests upon facts that are in dispute. Although Johnson testified that the non-uniformed officers did not participate in any of the kicking and trampling that occurred after Katalinic tackled him, he also testified that because he was face down and intent on protecting himself that he could not clearly identify those officers who were kicking him. In addition, Alicia testified that she observed McHale and Katalinic participating in the alleged beating.

Officers Curtis Hinkle, Shaun Williams, Nicholas White and Jim Walsh also move for summary judgment on Johnson's excessive force claim. Their arguments require little discussion. The premise of these Defendants' arguments rests upon a substantially flawed interpretation of Johnson's deposition testimony. These four officers argue that Johnson answered an interrogatory admitting that "*only* five officers" were present at the scene of the alleged beating. (Def. Mem. Supp. Summ. J. at 6 (emphasis in original)); (Def. Officers St. ¶ 6). Using the process of elimination, these officers point to certain instances where Johnson positively identifies certain officers who participated in the alleged incident, eventually ruling themselves out when the count reaches five.

First, the officers grossly distort Johnson's answers to their interrogatories. Nowhere in his answer does Johnson assert that *only* five officers participated in the incident. Instead, Johnson answers that: "[t]o the best of [his] memory, there were *at least* five police officers" at the scene of events. (Def. Officers Ex. 12). Johnson's answer is consistent with his deposition testimony that he could not be sure how many officers participated in the alleged beating but that it could have been five. (Johnson Dep.

7

at 167). Moreover, the "Event Query" indicates at least four police vehicles at the scene of the arrest, each containing two officers. (Pl. St. Ex. I). The Event Query identifies three marked squad cars, cars 414, 424, and 432, as "assisting" prior to the point Johnson was arrested. (Pl. St. Ex I). Moreover, deposition testimony from White, Walsh, Hinkle, and Williams suggests that, contrary to Defendant Officers' assertions, these officers might have exited their vehicle and assisted with Johnson's arrest. (Walsh Dep. at 16-20; White Dep. at 10-11; Williams Dep. at 60; Hinkle Dep. at 15, 22). Finally, Alicia Collins testified that she saw six officers at the scene. (Alicia Dep. at 21-22, 33, 40). Defendants' suggestion that it is undisputed that only five officers could possibly have participated in the alleged incident is at best a creative reconstruction of the factual record if not an outright distortion of it.

The Defendants seek summary judgment for Johnson's state-law battery claim on the same grounds as they seek summary judgment on his excessive force claims. The Court DENIES Defendants' Motion for Summary Judgment with regard to Count I and Count V. In addition, McHale and Katalinic argue that the Court should grant them qualified immunity with regard to Johnson's excessive force claim. This argument is based upon the premise that they did nothing beyond the initial seizure of Johnson, which as noted above is a material fact in dispute.

B.  *False Arrest Claim*

All of the officers except for Katalinic and McHale seek summary judgment on Count II of Johnson's claim, arguing that the undisputed facts demonstrate that each of them arrived after Katalinic and McHale placed Johnson in handcuffs and relied on the information provided to them by Katalinic and McHale. Therefore, the officers argue, they can not be liable for his allegedly false arrest. Johnson does not respond to the officers' argument, disputing neither its factual nor its legal basis.

Probable cause to arrest someone provides an absolute bar to a false-arrest claim. *Holmes v. Village of Hoffman Estates*, 511 F.3d 673, 679-80 (7th Cir. 2007). To determine whether an officer had probable cause, a court looks to the information as it reasonably appears to the arresting officer. *Id.* Moreover, so long as a reasonably credible witness or victim, including fellow law enforcement personnel, supplies information to an officer that someone has committed a crime, the officer may rely upon that information and is under no obligation to investigate further. *Id.*; *Speigel v. Cortese*, 196 F.3d 717, 726 (7th Cir. 2000); *see also United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (discussing "collective knowledge" doctrine).

Brownfield, Garcia, Walsh, White, Williams, and Hinkle all arrived after Katalinic and McHale had apprehended and handcuffed Johnson. The Court GRANTS summary judgment on Count II in favor of those six officers.

C.  *Unreasonable Search and Seizure*

All of the Defendants seek summary judgment on Johnson's unreasonable search and seizure claim (Count III). As before, Brownfield, Garcia, Walsh, White, Williams, and Hinkle argue that they arrived after Katalinic and McHale had apprehended Johnson. Again, Johnson fails to respond to their argument and the Court GRANTS summary judgment on Count III in favor of those six officers.

Katalinic and McHale argue that their initial stop and search of Johnson was reasonable under the principles set forth by *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The officers claim that they were investigating a possible narcotics transaction in a high crime neighborhood when they encountered Johnson, who matched the description of the alleged suspect and who acted suspiciously. If these were the undisputed facts, a *Terry* stop indeed would have been reasonable. *United States v. Baskin*, 401 F.3d 799, 791 (7th Cir. 2005) (evasive behavior can justify *Terry* stop); *United States v. Harris*, No.06-1630, 2007 WL 669289, at *2 (7th Cir. Mar. 5, 2007) (prolonged eye

9

contact, detour through muddy yard, hands in pockets, and nervous behavior in high crime area was suspicious behavior). The facts underlying the officers' argument, however, are in dispute.

Johnson first disputes whether the officers even received a dispatch, but points to no evidence in the record supporting this assertion. Instead, Johnson points to the failure of the Defendants to produce any computer record of the dispatch. Johnson does not move the Court to draw an adverse inference or strike the Officers' deposition testimony related to the dispatch based upon the spoliation of the evidence, and his denial of the Defendants' statement that Katalinic and McHale responded to a dispatch is without merit. Johnson also disputes that he matched the description given to the officers. The description given to the officers was indeed vague. The officers testified that the dispatch alerted them to a black male in dark clothing selling narcotics near 77th Street and Euclid Avenue. (Katalinic Dep. at 33-34; McHale Dep. at 28-29; Def. Officers Ex. 23 at 7). Johnson claims he did not match this description because the shirt he was wearing was blue with white lettering. This argument also is without merit. It was dark when the officers approached Johnson and given the information available to them at the time it was reasonable for the officers to conclude that Johnson's shirt qualified as "dark clothing."

Mere presence in a high-crime area, however, does not justify an investigatory stop. *Baskin*, 401 F.3d at 791 (citing *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)). The officers suggest that Johnson acted suspiciously — looking them dead in the eye, glancing over his shoulder, and hastening his pace. (McHale Dep. at 41). McHale's deposition testimony, however, blatantly contradicts the testimony he provided during a state court suppression hearing. There, McHale responded to a question directly about any suspicious behavior that the only thing suspicious about Johnson's behavior was that he was "just walking in the area [the officers] were responding to."

(Def. Officers St. Ex. 23 at 7). In addition, Katalinic testified during his deposition that Johnson engaged in no suspicious activity. (Katalinic Dep. at 39-40).

McHale's testimony at the suppression hearing, which occurred much closer to the events in dispute and which also was provided without the specter of this lawsuit hanging overhead, is at minimum inconsistent with his deposition testimony, if not irreconcilable. It more than creates an issue of fact as to whether the officers were justified in stopping Johnson at the outset. In addition, Johnson moves for summary judgment himself on this Count. As discussed above, however, the parties dispute the series of events leading to the officers initial stop of Johnson. Summary judgment is not appropriate for either party.

The officers also argue that it was reasonable for them to search Johnson's apartment because Alsusia consented to the search. The officers suggest that Alsusia invited them into the apartment to look around and that they remained at the threshold of the door. Alsusia's testimony, however, is quite different. She testified that she opened the door only after the officers threatened to break it down. Consent to perform a warrantless search is invalid, if a person provides it only under duress or coercion. *United States v. Graves*, 470 F.3d 311, 322 (7th Cir. 2006); *Valance v. Wisel*, 110 F.3d 1269, 1278-79 (7th Cir. 1997). Given the officers threats to enter the apartment forcefully, it cannot be said that Alsusia's consent was voluntary. Even if Alsusia did voluntarily consent to the officers entry of her apartment, she limited this consent. Alsusia told the officers "to stand right there" while she retrieved Johnson's identification. The officers, according to Alicia, did not remain at the apartment's threshold.[3]

---

[3] The officers state that "*only*" Alicia testified that the officers moved beyond the threshold. If the officers imply that Alicia's testimony is somehow insufficient to create a material fact, that implication is patently frivolous.

11

Instead, they followed Alsusia and peeked into several rooms, including the kitchen and a bedroom, thus exceeding the scope of Alsusia's consent.

Katalinic and McHale also suggest that the search was justified under the protective sweep doctrine. Under the protective sweep doctrine, officers may conduct cursory sweeps of a residence incident to an arrest in order to ensure their safety and the safety of others. *Leaf v. Shelnutt*, 400 F.3d 1070, 1087 (7th Cir. 2005). In this case, however, Katalinic and McHale arrested Johnson *outside* of his residence. Nothing in the record suggests that they believed Alsusia, Alicia, or any one else in the apartment might threaten their safety. Instead, it appears from the record that their only concern was to obtain Johnson's identification, something that Alsusia told them she would retrieve. (Def. Officers St. ¶ 43).

McHale and Katalinic also argue that they are entitled to qualified immunity on Johnson's search and seizure claim. They premise this argument on a version of the facts that is in dispute. The Court DENIES McHale's and Katalinic's and Johnson's Motions for Summary Judgment on Count III.

D.  *Malicious Prosecution Claim*

The Defendants move for summary judgment on Johnson's malicious prosecution claim, arguing that he cannot demonstrate that the state proceedings ended in a posture favorable to him. In order to state a claim for malicious prosecution, a plaintiff must prove, among other things, that the criminal proceedings terminated favorably to him. *Swick v. Liautaud*, 169 Ill.2d 504, 512, 662 N.E.2d 1238 (Ill. 1996). With regard to the "favorable termination" prong, the Illinois Supreme Court has held that when a prosecutor abandons a charge via a *nolle prosequi*, the proceedings terminate favorably for the accused unless the abandonment is for reasons not indicative of innocence. *Swick*, 169 Ill.2d at 513. If the *nolle prosequi* is the result of, for example, an agreement with the accused, misconduct on the part of the accused that prevents a trial, mercy requested or accepted by the accused, the institutions

of new criminal proceedings, or the impractibility of bringing the accused to trial, it does not indicate the accused's innocence. *Id.*

In this case, the reasons for the *nolle prosequi* are not clear. The only evidence Johnson points to in support of his claim is testimony from McHale during an unnamed preliminary hearing. During that hearing, neither the prosecution nor the defense made any motion and only McHale testified. McHale testified generally about the search and arrest of Johnson. Following McHale's testimony at a preliminary hearing, the state court, without explication, stated "finding of no probable cause." At the summary judgment stage, the bare use of a *nolle prosequi* is not sufficient to support a malicious prosecution claim. *Logan v. Caterpiller, Inc.*, 246 F.3d 912, 924-26 (7th Cir. 2001). That is, however, all that Johnson has presented here. At best, the preliminary hearing suggests that the state court believed that McHale did not have probable cause to search Johnson, which is not sufficient to demonstrate his innocence. The Court GRANTS the Defendants' Motion for Summary Judgment with regard to Count VI.

E.   *Illinois Hate Crime Claim*

McHale and Katalinic also move for summary judgment with regard to Johnson's hate crime claim, arguing that the undisputed evidence demonstrates that the only person to utter racial slurs was Garcia. Johnson disputes the Defendants' characterization of the evidence, but his dispute is unfounded. Johnson testified during his deposition that no one other than the Hispanic officer (Garcia) made any racial slurs to him and that he had testified to the full extent of the racial slurs. (Johnson Dep. at 162). Johnson points to the depositions of Alsusia and Alicia to suggest that other officers made racial slurs as well. At best, however, this testimony shows that some other unidentified officer, but not McHale and Katalinic, made racial slurs (perhaps that Johnson did not hear, but that the Collins'

13

did hear). The Court GRANTS McHale's and Katalinic's Motion for Summary Judgment with regard to Count VII.

F. *Medical Attention Paragraphs*

Johnson does not assert a claim for Defendants' failure to provide medical attention. Paragraphs 11 and 12 of the Second Amended Complaint, however, allege that an unnamed officer threatened to take his identification after Johnson requested medical attention and that other officers allowed Johnson to go to the hospital only after taking him to lockup. Defendants move to strike these paragraphs.

It is not settled whether courts evaluate claims of inadequate medical care brought by persons in custody who have not yet been convicted under the deliberate indifference standard or under the less demanding standard that asks whether the officers' conduct was objectively reasonable. *Smith v. Village of Norridge*, No. 06 C 4250, 2009 WL 210458, at *8 (N.D. Ill. Jan. 22, 2009) (citing *Williams v. Rodriguez*, 509 F.3d 392 (7th Cir. 2007) & *Lopez v. City of Chicago*, 464 F.3d 711 (7th Cir. 2006)). Under the latter standard, courts evaluate officers conduct in light of four factors: 1) whether the officers knew of the plaintiff's medical need; 2) the seriousness of that need in light of objective, physical symptoms; 3) the scope of requested care; and 4) the administrative, investigatory and penological interests of the police. *Id.*

The facts here are strikingly similar to the facts in *Smith*. In *Smith*, the plaintiff lodged an excessive force claim with a corresponding denial of medical attention claim. Like Johnson, the *Smith* plaintiff alleged that officers threatened him with extended lockup if he requested medical attention. Like Johnson, the *Smith* plaintiff eventually did receive medical care. And like Johnson, the *Smith* plaintiff suffered relatively minor injuries (Johnson was sent to the section of the emergency room for patients with less severe injuries, was given pain medication, and spent only one hour in the hospital). Johnson cannot demonstrate that any delay in receiving medical treatment caused him harm and the

14

Court GRANTS Defendants' Motion to Strike Paragraphs 11 and 12 of Johnson's Second Amended Complaint.

G.  *City of Chicago's Motion*

The City of Chicago moves for summary judgment on Johnson's first three claims, arguing that Johnson has not met the requirements for municipal liability set forth in *Monell v. New York City Dept. Of Social Services*. The City admits, for the purposes of the motion, that Johnson has adequately established a genuine issue of material fact as to whether a widespread practice of failing to investigate and discipline police misconduct exists. The City argues, however, that the undisputed facts demonstrate that the City was not deliberately indifferent to the alleged policy and that the policy did not cause Johnson's injuries.

The City's argument hinges upon the ratification of a recent collective bargaining agreement with the police officers' union. Prior to negotiating that agreement, William Beavers, Chair of the City Council Committee on Police and Fire introduced a resolution that questioned aspects of the expiring collective bargaining agreement that, in Beavers's view, undermined the ability of the police department to hold its employees accountable for their behavior. After the Beavers's resolution, the City Council and the police officers' union agreed on a collective bargaining agreement that amended in two ways the manner in which "not sustained" complaints against police officers were handled: 1) the police department would retain complaints that were not sustained for seven years rather than five; 2) the police department could use complaints that were not sustained in future disciplinary proceedings to determine credibility and notice. These changes, the City suggests, allowed it to implement a "pattern analysis" program. The City argues that these efforts demonstrate that it did not turn a blind eye to the problems created by an alleged persistent failure to investigate and discipline its officers.

15

Deliberate indifference requires more than a mere failure to eliminate a practice. It requires a deliberate choice to follow a course of action. *City of Canton v. Harris*, 489 U.S. 378, 389, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) *Wilson v. City of Chicago*, 6 F.3d 1233, 1240 (7th Cir. 19930. Adherence to an approach that fails, however, may form the basis for deliberate indifference. *Bd. Of County Comm'rs of Bryan County, Ok. v. Brown*, 520 U.S. 397, 407, 117 S.Ct. 1382, 137 L.Ed. 626 (1997). Two courts in this district have addressed whether the City Council's recent resolution and change in the collective bargaining agreement with the police officers' union demonstrates that, as a matter of law, it did not act with deliberate indifference, each reaching different conclusions. *Moore v. City of Chicago*, No. 02 C 5130, 2007 WL 3037121 (N.D. Ill. Oct. 15, 2007); *Arias v. Allegretti*, No. 05 C 5940, 2008 WL 191185 (N.D. Ill. Jan. 22, 2008).

The Court in *Moore* explained that the eventual failure of the City Council's efforts to change its alleged practice of ignoring police misconduct is insufficient to demonstrate that it acted with deliberate indifference. *Moore*, 2007 WL 3037121, at *11. The Court emphasized that the City Council held hearings and adopted changes to the collective bargaining agreement, which demonstrated that it sought to change the way the police department investigated complaints from citizens. *Id.* Consequently, the court held that the undisputed evidence demonstrated that the City did not turn a blind eye to the alleged practice. *Id.* The *Moore* Court, however, did not discuss any evidence presented by the plaintiff that might tend to demonstrate that the alleged hearings were mere lip-service.

That is not the case here. In this case, Johnson points to evidence in the record to suggest that the City's efforts are merely cosmetic and not truly intended to address the alleged widespread practice of failing to investigate and discipline rogue police officers. Johnson asserts that: 1) the City Council did not mandate that the Office of Professional Standards (OPS) of the Police Department's Internal Affairs Division (IAD) incorporate the change in the contract into its practices; 2) the Chair of the City

16

Council's Police Committee took no steps to determine whether the contact change was used by OPS or IAD; 3) the City Council or its delegate never issued written policies or guidelines regarding the manner in which OPS would conduct "pattern analysis"; 4) no one in OPS received formal training on conducting "pattern analysis." (Johnson St. ¶¶ 28-32). In fact, according to Johnson, OPS has used "pattern analysis" only twice since the contract change in 2002. (Murphy Dep. at 127). These facts could lead a jury to find that the City merely paid lip service to a problem that it was aware of, allegedly knowing all the while that the changes to the CBA would not resolve the problem caused by tacit approval of police misconduct. The court in *Arias* denied summary judgment on similar grounds, and the Court finds its reasoning persuasive. *See Arias*, 2008 WL 191185, at * 4.

The City also argues that the alleged policy is not the moving force behind the individual Defendants' violation of Johnson's rights. This argument merits little discussion. The City argues only most generally that Johnson "cannot adduce any evidence of the tight connection between an municipal policy or practice and misconduct by these particular defendant officers." The City's argument, comprised of three short paragraphs and not a single citation to caselaw or the record, is nearly so cursory that the Court should summarily deny it.

Contrary to the City's argument, however, Johnson has pointed to evidence in the record that could lead a reasonable jury to believe that the City's practice of inadequate investigation and discipline of rogue officers caused these officers to violate his rights. For example, Johnson points to the fact that one of the Defendant Officers could not identify the nature of many of the complaints against him. Another could not recall a single complaint lodged against him, despite the fact that at least twelve complaints had been lodged in a five-year period. Two other officers testified that they do not recall any police training regarding how to ensure that they perform their job within constitutional bounds. Moreover, Plaintiff points to the testimony of its expert regarding the import of the officers' lack of

knowledge of the law. The City argues that these facts do not "necessarily lead to the presumption that the officer in question will violate the law because he knows he will not be disciplined for his conduct." True, that is not the *only* conclusion at which a jury may arrive from the facts put forth by Johnson. It is, however, a reasonable one, which is all that is necessary to defeat the City's Motion.

The Court DENIES the City's Motion for Summary Judgment on Johnson's *Monell* claims. To the extent that the Court has granted summary judgment in favor of some of the individual defendants, the Court notes that the City cannot be held accountable on any of Johnson's claims without an underlying violation (whether based on the Constitution or upon state law) from one of the individual officers.

IT IS SO ORDERED.

June 9, 2009
Dated

Hon. William J. Hibbler
United States District Court